## THE CLINTONIA.

### NEALL et al. v. GENERAL MARINE INS. CO. OF DRESDEN.

(District Court, S. D. New York. July 30, 1900.)

1. SHIPPING—LIEN FOR INLAND FREIGHTS—CONSTRUCTION OF CHARTER.

A charter for a vessel provided that "the master shall, if required, give his draft on consignees, payable 3 days after arrival, for whatever inland railway charges are collectible from receivers of cargo as shown on bills of lading and manifest, subject to the usual charges of one per cent. commission and cost of insurance; and the draft shall be a lien on the vessel and her freight." While the vessel was loading and after she had loaded a considerable quantity of cargo shipped on through bills, on which there were inland charges, both she and the cargo on board were so badly damaged by a fire which occurred on the wharf that the voyage was abandoned, and the vessel and cargo undestroyed were sold in a suit for salvage charges. No drafts for inland freight had been required of

the master previous to the fire, and none given, and a demand therefor afterwards made was refused. *Held*, that under such provision there was no lien on the vessel for inland freight, unless a draft therefor had been given; that the conditions had been so changed by the fire that such drafts were no longer demandable, because the charges for inland freights were no longer "collectible from receivers of cargo," and it was against such collections, to be made by the vessel for a commission, that the drafts were to be drawn; nor could the insurance required to be furnished at the cost of the charterer for the protection of the vessel be then effected.

2. SAME—EFFECT OF CUSTOM.

In view of the provision of the charter fixing the duty and liability of the vessel ·in regard to inland freights, no custom or practice, even if established, could be allowed to affect or change the express contract of the parties.

3. MARINE INSURANCE—ADVANCES ON FREIGHT.

The charterer's agents having, previous to the fire, procured insurance for the benefit of whom it might concern on the inland freights, which it had obligated itself to advance, presumably designed in conformity to the charter provision to inure to the benefit of the vessel when drafts for such freights should be given, the insurer, and not the ship, would be primarily, as well as ultimately, liable for the loss.

4. SAME—WHAT CONSTITUTES ADVANCES.

An insurance policy for the benefit of whom it may concern, covering advances on inland freights on a cargo, is effective for the protection of a charterer which had obligated itself by contract to advance such freights, although no payment had actually been made thereon when the cargo was lost, the obligation given being in effect an advance for the purposes of the insurance.

In Admiralty. Libels against a vessel and against an insurance company to recover advances made on inland freight charges on a cargo shipped on through bills of lading, and destroyed by fire at the wharf while loading.

Convers & Kirlin, for libelant United States Shipping Co. and respondent General Marine Ins. Co. of Dresden.

Robinson, Biddle & Ward, for libelants Neall and others.

Butler, Notman, Joline & Mynderse, for the Clintonia.

BROWN, District Judge. The above libels grew out of a fire which originated on one of the wharves at Newport News on April 27, 1897, and extended to the steamship Clintonia, which was loading alongside, and so damaged her that the voyage was broken up, and ship and cargo were sold in a subsequent suit for salvage.

In the first above libel the net proceeds of the Clintonia amounting to $2,759.49, after satisfying the claims allowed in the salvage suit, have been attached upon a claim of a lien thereon in libelants' favor, to the amount of $3,092.11 for advances paid by them to different railroad companies for inland transportation charges on through bills of lading, upon the goods laden on board the Clintonia partly at Norfolk, and partly at Newport News, prior to the fire. For those charges, it is contended that the steamer became responsible under the terms of her charter to the shipping company.

In the second libel the same advances for inland charges are claimed against the respondent insurers upon a policy of $6,000 on "advances and disbursements" taken out for the benefit of whom it may concern by the libelants, who compose the firm of Peter Wright

& Sons, and who were the financial agents of the United States Shipping Company, and accustomed to discount for that company the master's drafts given for inland charges and freight differences, and to provide the insurance requisite to cover them.

The charter of the Clintonia was a charter of affreightment to the United States Shipping Company for a single voyage. That company had vessels of its own, and it chartered others, and in all it dispatched from Atlantic ports from 100 to 150 vessels yearly. The cargoes came largely from inland points, whence they were brought to the seaboard by different railroads upon through bills of lading stating a gross freight payable on delivery at the foreign ports. These bills of lading were given at the interior points of shipment and were signed in behalf of the railroad companies and of the shipping company jointly, each being made separately responsible for its own share of the transportation. By agreement between them the shipping company was made responsible to the railroads for the latters' share of the through freight, i. e. for the inland transportation, from the moment of the delivery of the goods at the seaboard within reach of the vessel's tackles. Under that obligation the shipping company paid the railroad companies for inland charges, as appears from the adjustment made in the salvage suit, $3,021.22 on inland goods laden on the Clintonia before the fire, which sum it now seeks to charge upon the ship.

The usual course of business was for the master on clearance to give in settlement of freight his obligation to the charterer called a draft, with a lien on vessel and freight agreeing to pay a given sum equal to the whole freight collectible at the foreign port both on the through bills of lading, as well as on the ship's own bills of lading for local cargo shipped at the point of loading, less the charter hire and certain other stated charges. This obligation contained a direction to his consignees to pay the same and to deduct it from the freight due the vessel. By "consignees," I understand the consignees of the ship to be there referred to, who are expected to collect the freight on discharge.

No doubt the established usages of the business are part of the implied contract if clearly proved and not inconsistent with the written charter. But the provisions of this charter clearly distinguish between the ship's own bills of lading and the freight payable thereon, with a settlement by draft of differences between that freight and the charter hire, and a settlement by draft for the inland charges. For the former, a lien on freight alone is authorized; for the latter, a lien on both vessel and freight. The former, moreover, was only demandable "on clearance"; the latter, as often as the different consignments were loaded. Clause 11 of the charter provides:

"The master shall, if required, give his draft on consignees payable 3 days after arrival for whatever inland railway charges are collectible from receivers of cargo as shown on bills of lading and manifest, subject to the usual charges of one per cent. commission, and cost of insurance; and the draft shall be a lien on the vessel and her freight."

There is no other provision in the charter authorizing a lien on the vessel for inland charges, or for making such charges any debt

of the ship. Clause 10 provides, as I understand it, for the settlement of charter hire by the freight on the (ship's own) bills of lading, with a draft for the amount of any difference, and a lien therefor on the freight alone. That difference in this case was small, and as I understand, does not enter into this controversy. Goods laden under inland through bills of lading, are dealt with by clause 11 above quoted, and by clause 18 of the charter, which provides for "receipts" to be given by the master for such goods, and the delivery thereof at the foreign port on presentation of a through bill of lading agreeing in particulars with the master's receipt.

In the present case, no bills of lading were given by the ship for any of the inland goods; but authorized master's receipts were given for the inland goods laden at Norfolk, but not for those laden at Newport News, where the loading was incomplete, being interrupted by the fire. No draft was given by the master; nor was any requested by the shipping company until after the fire, when the master refused to give any draft.

No lien for inland charges can arise against the ship, except upon some express contract by the charter or otherwise, or upon some settled usage or course of dealing from which such an agreement can be fairly implied. The charter provisions in this case certainly do not give such a lien, since the prescribed conditions of clause 11 in several particulars were evidently unfulfilled.

(a) The provision is that "the draft shall be a lien"; not that the inland charges without a draft shall be a lien from the moment of loading; and no draft was ever given. No doubt the master would be bound to give a draft, "if required," from time to time during loading as each consignment was laden; but (b) the company did not ask or "require" this; and it was not only customary to defer this until the loading was complete, but the company might, at its option, dispense with a draft altogether, and look out for the collection of the inland freights by other means. No draft having been asked of the master before the fire, up to that time no duty rested on him to give it. The charterer's option was not exercised. After the fire, the circumstances were so wholly changed, that other provisions of clause 11 made a demand of the draft then too late, and no longer enforceable.

The provision is for a draft, (c) "for whatever railway charges are collectible from receivers of cargo." This means whatever is apparently collectible according to the circumstances as they exist at the time when the demand for a draft is made, or when the duty to give it arises. But after the fire, when this demand was first made, the cargo was in part wholly destroyed; on that part nothing was "collectible from the receivers," nor (d) could there any longer be any "receivers" of such cargo. The residue of the cargo was so damaged by the fire as to be presumably not worth forwarding, since it was ordered sold in the salvage suit, and upon nearly all of it the net proceeds were insufficient to pay the inland freights and these freights were therefore no longer "collectible from the receivers of cargo."

Again, (e) the draft was to be given "subject to the cost of insurance"; but in the situation after the fire, the inland freights were manifestly incapable of being insured. This provision for insur-

ance was designed for the ship's benefit. It was manifestly indispensable to her security, from the moment she should become liable to a lien by the master's draft for freights payable on delivery at a foreign port. If for this purpose new insurance was to be relied upon, that could no longer be obtained after the fire, and this essential condition could not be performed. This objection, however, would not apply if there were already existing insurance which the company could make available to the ship, to which reference will be made below.

Nor is the libelants' case strengthened by the further reference of clause 11 to inland freights "collectible of the receivers of cargo as shown on bills of lading and manifest." For (f) the bills of lading do not "show" any inland freights collectible on goods destroyed, nor on goods so damaged that commercially they cannot be forwarded but must be sold before the voyage begins. On the contrary, the bills of lading provide for the payment of freights only on delivery at the port of destination; and at the time when this draft was "required" there could not be any such delivery as respects the goods or inland freights here in question.

The entire situation was, therefore, so changed in this case by the fire, that in my judgment no draft could thereafter be lawfully demanded of the master under the charter, because the essential conditions contemplated by clause 11 no longer existed or could be complied with, and that clause therefore became inapplicable in the existing situation.

It is said, however, that under the established usage and known course of dealing, independent of the charter, the inland charges upon the goods when laden on board become ipso facto a debt of the ship. But I do not find any sufficient foundation for this claim. Such a charge is a highly burdensome one, and without any direct benefit to the ship. Her interest is only in the ocean freights, which are distinguished and separated from the inland charges in the manifest furnished her. The claim here is, not that the ship should become merely collecting agent of the inland freights, but an insurer of them for the charterer's benefit from the moment the goods were put on board. Such a claim, aside from any express agreement written or oral and based only upon an alleged usage, should only be admitted on clear evidence of such a usage in the particular circumstances under which the claim arises. Here there is no evidence that by usage the inland charges are assumed and understood to become a debt of the ship, from the moment of loading; but only that the general practice is similar to the provisions of this charter, in the absence of any charter or specific agreement. The alleged custom, therefore, has reference only to the conditions usually existing and the practice to give a draft on clearance under such conditions; but it proves nothing as to the ship's responsibility for inland freights while loading, or as to her obligation to give a draft before clearance, when she cannot clear, and after the goods have been destroyed or so damaged that they cannot be forwarded and the voyage is broken up.

But if any such custom were sufficiently proved, I should feel bound to find it in this respect superseded by the express conditions

of clause 11 of this charter, because inconsistent with the restrictions of that clause. One of the most material conditions of clause 11 is that any such draft is "subject to the cost of insurance." This requires the charterers either to pay the ship the cost of insuring the inland charges which she assumes to collect, or else to furnish the ship available insurance thereon for her own protection. This must evidently be done contemporaneously with the giving of the draft, since the ship cannot be required, under an arrangement that is optional with the charterer, to be for any period uncovered by insurance. The custom to give a single draft at the close of loading, instead of numerous separate drafts on each consignment, is manifestly greatly to the convenience of both parties. But this alone would leave the contingency of loss during loading unprovided for. The evidence shows the practice of the shipping company to be to procure insurance in advance through its financial agents. That was done in this case. It was done in the expectation of receiving on clearance the usual draft including the inland charges. This insurance, for whom it may concern, was manifestly designed for the benefit of all interested in the draft or in the inland charges which were insured by the policy. The persons interested were, first, the shipping company under its obligation to pay the railroad companies as soon as the goods were on board the Clintonia; next the ship and owners, on their obligation when the draft was given; and, finally, Peter Wright & Sons, upon their discount of the expected draft. As the shipping company was bound to pay or provide insurance for the vessel's benefit on receiving the draft, it is not conceivable that that company expected to pay for or to procure duplicate insurance for the same interest. The insurance taken out in advance on the inland freights must, therefore, have been designed in part for the ship's benefit, and for the fulfillment of clause 11. Mr. Gotheil testifies that it was intended to cover the company's obligations. It must be inferred, therefore, that any practice of calling for a draft for inland charges includes covering the ship's liability by available insurance thereon; so that if any draft could have been lawfully called for in the present case after the fire, it could only be upon covering the ship's liability by insurance through the application of the policy in the second suit to the ship's benefit. That policy being originally intended for that purpose would thereby become the primary fund for the payment of the ultimate loss on inland freights, with consequently no right of subrogation in favor of the insurers against the ship on payment of the loss.

If on the other hand, the policy was not designed to cover the ship's liability on giving a draft, so that the shipping company at the time the draft was demanded could not furnish the ship with valid insurance, nor enable her to get it, and did not offer to pay the cost of it, that company had no right to a draft under any practice or custom that appears in evidence. The result would be the same in either view, that the insurance company must pay the loss and not the ship.

2. The policy seems expressly designed to cover all interests as above stated, and to be sufficient for the present loss. It was for

whom it might concern, and it covered: "(a) Advances $^{and}$/or disbursements secured by master's draft pledging the vessel and freight, insuring against loss total or partial, caused by loss total or partial, of the vessel or freight pledged through sea perils, or by postponement of the lien to prior liens subsequently arising or by contribution to general average.

"(b) Advances upon freight for inland freight $^{and}$/or charges upon cargo $^{and}$/or differences in ocean freight due by the ship secured by master's draft, etc.

"(c) It is agreed that advances $^{and}$/or disbursements $^{and}$/or advances for differences in freight made prior to the signing of the master's draft, or pending negotiations of it, are also covered by this policy, as interest may appear."

Had any draft been given for inland freight, clearly clauses (a) and (b) would have covered them; and clause (c) seems to me plainly designed to cover the risk of loss on advances generally, prior to obtaining the master's draft. That is the precise situation here, which also needed to be covered under the practice of waiting until the loading was complete before calling for drafts for inland charges; and the application, as the answer alleges, was for insurance on advances "shipped or in course of shipment."

It is objected that clause (c) did not take effect, because the shipping company had not in fact made any advances at the time of the fire. But its obligation to pay had become complete and absolute before the fire, and it afterwards made the payments which it was in law compelled to do. The company had advanced its obligation to pay, and by the receipt of the goods this obligation became fixed and absolute. This was sufficient; for insurance purposes, the advance was in effect already made, as much as if the company's note had been given therefor, although not actually paid until afterwards.

Clause (c) as I have already said was not intended to be limited to drafts given, but to secure the shipping company prior thereto, and prior to any lien obtained on the ship for inland charges. The company's interest in these charges was plainly an insurable interest from the moment the goods were shipped on board, independent of any lien on the ship therefor. I do not perceive any sufficient legal defense to the company's claim for the loss on inland freight sustained by it through the fire: and the libelants in the second libel are entitled to a decree for the amount of that loss over and above the amounts heretofore received by them on account, with costs.

As respects the sum of $739.41 apparently drawn by the Buffalo Iron Company improperly from the fund in the salvage suit before the adjustment of the charges, if the insurance company was a party or privy to that proceeding, I think the shipping company which also was a party cannot be charged with it, both being presumably chargeable for its disappearance; otherwise, the latter should I think be charged with it, as either lost by its inattention, or recoverable, if it be recoverable, at its own charge and risk.

The first libel is dismissed with costs; in the second, the libelants are entitled to a decree with costs.